AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No. |
| JERRAUN PARKER | ) | |
| | ) | 3:25 MJ 0426 |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __October 13, 2025__ in the county of __Montgomery__ in the __Southern__ District of __Ohio__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(g)(1) and 924(a)(8) | Felon in possession of ammunition |
| 21 U.S.C. §§ 846 and 841(b)(1)(B) | Conspiracy to possess with intent to distribute and to distribute heroin and methamphetamine |
| 21 U.S.C. § 856(a)(1) | Maintaining a drug involved premises |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

CAMERON BASILE
Digitally signed by CAMERON BASILE
Date: 2025.10.14 11:40:41 -04'00'

*Complainant's signature*

CAMERON D. BASILE, SA DEA
*Printed name and title*

Sworn to before me and signed in my presence via telephone.

Date: 10/14/25

*Judge*

City and state: DAYTON, OHIO

U.S. MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Cameron D. Basile, hereby duly sworn, declare and state:

## INTRODUCTION

1. I am a Special Agent ("SA") of the Drug Enforcement Administration ("DEA"), assigned to the Dayton Resident Office. I therefore am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 878. Moreover, I am an "investigative law enforcement officer" within the meaning of 18 U.S.C. § 2510. The information contained in this Affidavit is either personally known by me or relayed to me by other law enforcement officers involved in this investigation.

2. I have been employed as a law enforcement officer by the DEA since May 2023, and I am currently assigned to the Dayton Resident Office. As a SA with the DEA, I attended multiple trainings at the DEA Training Academy in Quantico, Virginia that included a 17-week Basic Training Academy with various specialized trainings focusing on narcotics identification, surveillance techniques, methods of operation of narcotics traffickers, evidence handling, undercover operations, and current trends and patterns involving the distribution of narcotics, as well as other areas of drug enforcement.

3. During my career with the DEA thus far, I have participated in an assortment of controlled substances investigations, including those involving marijuana, cocaine, heroin, methamphetamine, fentanyl, metonitazene, and counterfeit pharmaceuticals. To date, I have assisted in the investigation of financial crimes to include money laundering, structuring habits, and bulk cash smuggling. I have interviewed witnesses, subjects, and defendants involved in and/or arrested for drug violations, and have participated in several joint interagency federal and state investigations. Additionally, I have participated in and supervised the use of confidential

1

sources, conducted physical surveillance, affected search warrants and arrest warrants, and written numerous reports. I have also written multiple affidavits in support of applications for search warrants, including search warrants for searches of residences, cellular telephone location pings, suspicious mail parcels, and GPS trackers. Through my training, I have become familiar with coded terminology utilized by drug trafficking organizations to disguise their illegal activities and the manner in which they conduct these illegal activities. Through my training and experience, including on-the-job discussions with other law enforcement agents and cooperating suspects, I am familiar with the activities of drug smugglers and drug trafficking distribution networks.

## PURPOSE OF AFFIDAVIT

4. I make this affidavit in support of a criminal complaint and arrest warrant for JERRAUN PARKER for violations of 18 U.S.C. § 922(g)(1) (Felon in possession of ammunition) and 21 U.S.C. §§ 846 and 841(b)(1)(B) (conspiracy to possess with intent to distribute and to distribute controlled substances) – namely, 100 grams or more of a mixture or substance containing a detectable amount of heroin (a schedule I substance) and 50 grams or more of a mixture or substance containing a detectible amount of methamphetamine (a schedule II substance), and 21 U.S.C § 856 (a)(1) (maintaining a drug involved premises).

## PROBABLE CAUSE

5. Between January 2025 to the present, investigators of the DEA Dayton Resident Office (DRO) and Dayton Police Department (DPD) have investigated JERRAUN PARKER, a.k.a. "Goldie" (hereinafter referred to as "PARKER"), for his role supplying controlled substances – including fentanyl, cocaine, and methamphetamine – in Dayton, Ohio. PARKER resides at 5115 Well Fleet Drive, Trotwood, Ohio 45426.

6. I am aware that PARKER is on federal supervised release having been convicted

2

of possession with intent to distribute 10 grams or more of a mixture or substance containing a detectable amount of carfentanil in Southern District of Ohio Case No. 3:17-cr-117. In addition to the federal narcotics charge, I have learned that PARKER's criminal history includes, but is not limited to prior convictions for: Receiving Stolen Property (2003), Burglary (2006), Receiving Stolen Property (2006), Burglary (2007), Receiving Stolen Property (2007), Possession of Drugs (2009), Attempted Burglary (2009), Possession of Drugs x 2 (2011), Trafficking in Drugs x 2 (2011), Possession of Heroin (2014), Possession of Drugs x 2 (2014),

7. On October 10, 2025, DPD Detective (Det.) John Rice was issued a state search warrant for PARKER's residence at 5115 Well Fleet Drive to search and seize items related to possession of controlled substances, in violation of Ohio Revised Code 2925.11, and trafficking in drugs, in violation of Ohio Revised Code 2925.03.

8. On October 13, 2025, at approximately 9:55 a.m., DPD and DEA investigators served the state search warrant at 5115 Well Fleet Drive. During the execution of the search warrant, multiple occupants were present at the residence. Klarissa Draper-Alexander, and two juvenile males complied with law enforcement commands and exited the residence. Draper-Alexander and the juveniles were subsequently detained by investigators. At this time, PARKER did not exit the residence.

9. DPD investigators made entry into the residence and identified that an individual had locked themselves inside of the master bathroom attached to the northwest bedroom of the residence. Investigators made entry into the bathroom and observed PARKER flushing illegal drugs down the sink and the toilet. DPD investigators detained PARKER and escorted him outside. While outside, investigators observed that PARKER's torso was covered in a white residue. Investigators field tested the substance found on PARKER which tested presumptive positive for

3

methamphetamine. DPD Det. John Rice then read PARKER his Miranda warnings. Det. Rice then asked PARKER if he understood his rights, and PARKER said he understood. Det. Rice then placed PARKER inside of a DPD marked police cruiser.

10. At approximately 10:00 a.m., investigators began searching the residence. Upon searching the residence, DEA and DPD investigators identified the northwest bedroom as the bedroom utilized by PARKER. While searching the northwest bedroom, investigators located a clear ziplock bag containing seven clear baggies of suspected illegal drugs in the top drawer of the dresser. The seven baggies are described as follows:

-**Exhibit 1**: One clear baggie containing approximately 8.2 grams of a white rock-like substance which field tested presumptive positive for cocaine base (crack cocaine).

-**Exhibit 2**: One clear baggie containing approximately 6.8 grams of a brown rock-like substance which field tested presumptive positive for heroin.

-**Exhibit 3**: One clear baggie containing approximately 15.7 grams of a brown powder-like substance suspected to be heroin.

-**Exhibit 4**: One clear baggie containing approximately 10.4 grams of a brown rock-like substance suspected to be heroin.

-**Exhibit 5**: One clear baggie containing approximately 5.1 grams of a white powder-like substance which field tested presumptive positive for cocaine base (crack cocaine).

-**Exhibit 6**: One clear baggie containing approximately 14.6 grams of a white powder-like substance which field tested presumptive positive for cocaine.

-**Exhibit 7**: One clear baggie containing approximately 24.6 grams of a brown rock-like substance suspected to be heroin.

11. Investigators continued searching the master bedroom and located a small digital

4

scale with residue and a silver handheld press.

12. Based on my training and experience, and the training and experience of other investigators involved in this investigation, I know that drug traffickers utilize digital scales to measure out quantities of illicit drugs for themselves and customers. Additionally, I know that drug traffickers utilize small handheld presses to press illegal drugs into hockey puck sized quantities of illegal drugs known as "pucks". With this, information, I believe PARKER utilized or intended to utilize the digital scale and the handheld press in furtherance of his drug trafficking operation.

13. Investigators continued searching the master bedroom and located one green Apple iPhone with a black case and one black Apple iPhone with a clear case on a side table. Furthermore, investigators located a small box containing nine rounds of assorted 9mm ammunition. Investigators inspected the ammunition and observed there were three rounds of 9mm Luger ammunition stamped "FC" on the headstamp near the primer. These rounds had red-colored projectiles with a flat nose. Investigators also observed there were six rounds of 9mm Luger ammunition stamped "CBC" on the headstamp near the primer. These rounds had copper projectiles.

14. Due to PARKER's criminal history, I am aware that PARKER is prohibited under federal law from possessing ammunition. Additionally, I am aware that the 9mm ammunition recovered within PARKER's residence was not manufactured in the state of Ohio and therefore traveled in and/or affected interstate or foreign commerce.

15. Investigators continued searching the master bedroom and located a small safe. Upon opening the safe, investigators located approximately $11,500 United States currency. The currency was seized by DPD. Based on my training and experience, and the training and experience of other investigators involved in this investigation, I know that drug trafficking is a

lucrative business. I know that drug traffickers can amass large amounts of currency from distributing illegal narcotics. I believe the currency located in the master bedroom utilized by PARKER are illicit proceeds derived from his sale and distribution of illegal drugs.

16. Next, investigators began searching the master bathroom where investigators previously observed PARKER flushing illegal drugs in the sink and toilet. Investigators located a clear bag containing the residue of a white rock-like substance near the sink.

17. Based on my training and experience, and the training and experience of other investigators involved in this investigation, I believe the bag previously contained a quarter pound (equivalent to approximately 113 grams) of methamphetamine due to the residue located inside of the clear bag, the residue located on PARKER after he was detained, and statements later made by PARKER during an interview with investigators (further detailed in Paragraph 20).

18. Investigators continued searching the master bathroom and removed the toilet from the floor. Upon doing so, investigators located two clear bags weighing approximately 149.9 gross grams which were found to be flushed down the toilet. These bags were still intact and contained contents that appeared to be an unknown rock-like substance. Investigators suspect the contents to be illegal drugs. The unknown rock-like substance was visibly wet and discolored from being flushed down the toilet. Investigators conducted a field test of the illegal drugs. Upon doing so, the field test showed the substance presumptively contained a mixture of heroin and splenda, but returned inconclusive.

19. Based on my training and experience, and the training and experience of other investigators involved in this investigation, I know that drug traffickers utilize diluents, also known as cutting agents, to mix into illegal drugs to increase the volume of the illegal drugs. Additionally, I know that splenda is utilized by drug traffickers as a diluent to increase volume of illegal drugs.

6

Due to the field test returning as a suspected mixture of heroin (which investigators suspect was located at the residence based off the presumptive positive field tests on brown powdered substances located in the master bedroom) as well as splenda, I believe that the bag is an illegal mixture containing heroin and a diluent, specifically splenda. Additionally, I believe that the field test result for the bag did not return as a conclusive match due to the exterior of the bag containing being covered in water and feces, as well as the interior of the bag containing contaminated water.

20. DPD Det. John Rice and I conducted an interview with PARKER while he was detained. During the interview, PARKER told investigators that he had flushed approximately a quarter pound (equivalent to approximately 113 grams) of methamphetamine. Investigators asked PARKER why he flushed the drugs, and PARKER stated "because who wants to go to jail." Investigators asked PARKER who the illegal drugs inside residence belonged to. PARKER subsequently told investigators that the illegal drugs found inside of the residence belonged to him. Investigators asked PARKER about the origins and ownership of the currency located in the master bedroom. PARKER stated he earned the money from his job. Investigators asked PARKER how he gets paid from his job, which PARKER replied that he gets paid by direct deposit. PARKER then stated he withdraws the cash from his bank account. PARKER also stated to investigators that both cellular phones located on the table in the bedroom belonged to him. PARKER voluntarily gave investigators the passcodes for the phones.

## CONCLUSION

21. Based on the foregoing, I respectfully request that the Court issue an arrest warrant for PARKER because he has violated the following offenses: felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); conspiracy to possess with intent to distribute heroin and methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B); and maintaining

a drug involved premises, in violation of U.S.C § 856 (a)(1).

CAMERON BASILE
Digitally signed by CAMERON BASILE
Date: 2025.10.14 11:45:46 -04'00'

CAMERON D. BASILE
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me,

this 14th day of October 2025

UNITED STATES MAGISTRATE JUDGE